FILED

**IN THE UNITED STATES DISTRICT COURT,**
**EASTERN DISTRICT AT GREENEVILLE, TENNESSEE** 01 AM '05

PACIFIC CAPITAL, L.P., a
Delaware limited partnership,

U.S. DISTRICT COURT
EASTERN DIST. TENN.

    Plaintiff,

BY
Case No. 2:05CV103 CLRK

vs.

EMERGYSTAT, INC., a Mississippi corporation,
SOUTHLAND HEALTH SERVICES, LLC,
a Mississippi limited liability company,
GLENN CRAWFORD, JOSEPH DONOVAN,
CRAIG PANTER, LARRY LUNAN,
BAD TOYS HOLDINGS, INC., a Nevada
corporation, ROY JOSEPH CERONE and
GENERAL ELECTRIC CAPITAL CORPORATION,
a Delaware corporation,

    Defendants.

## COMPLAINT

    Plaintiff states its claims for relief as follows:

### PARTIES, JURISDICTION, AND VENUE

  1.  Pacific Capital, L.P. is a Delaware limited partnership with its principal place of

business in Ann Arbor, Michigan (hereinafter referred to as "Pacific").

  2.  Emergystat, Inc. is a Mississippi corporation with its principal place of business in

Alabama, which conducts business in Tennessee (hereinafter referred to as "Emergystat" and

sometimes referred to collectively with Southland, Crawford, Donovan, Panter, Lunan, BTH and

Cerone as the "Conspiracy Defendants").

1

3.     Southland Health Services, LLC is a Mississippi limited liability company, which conducts business in Tennessee (hereinafter referred to as "Southland"and sometimes referred to collectively with Emergystat, Crawford, Donovan, Panter, Lunan, BTH and Cerone as the "Conspiracy Defendants").

4.     Glenn Crawford is a resident of Alabama who has engaged in business in Tennessee and/or has engaged in activities causing tortuous events to occur in Tennessee (hereinafter referred to as "Crawford" and sometimes referred to collectively with Emergystat, Southland, Donovan, Panter, Lunan, BTH and Cerone as the "Conspiracy Defendants").

5.     Joseph Donovan is a resident of Alabama who has engaged in business in Tennessee and/or has engaged in activities causing tortuous events to occur in Tennessee (hereinafter referred to as "Donovan" and sometimes referred to collectively with Emergystat, Southland, Crawford, Panter, Lunan, BTH and Cerone as the "Conspiracy Defendants").

6.     Craig Panter is a resident of Mississippi who has engaged in activities causing tortuous events to occur in Tennessee (hereinafter referred to as "Panter" and sometimes referred to collectively with Emergystat, Southland, Donovan, Crawford, Lunan, BTH and Cerone as the "Conspiracy Defendants").

7.     Larry Lunan is a resident of Tennessee (hereinafter referred to as "Lunan" and sometimes referred to collectively with Emergystat, Southland, Donovan, Crawford, Panter, BTH and Cerone as the "Conspiracy Defendants").

8.     Bad Toys Holdings, Inc. is a Nevada corporation with its principal place of business in Tennessee (hereinafter referred to as "BTH" and sometimes referred to collectively with Emergystat, Southland, Donovan, Crawford, Panter, Lunan and Cerone as the "Conspiracy Defendants").

2

9.      Roy Joseph Cerone is a resident of Tennessee (hereinafter referred to as "Cerone" and sometimes referred to collectively with Emergystat, Southland, Donovan, Crawford, Panter, Lunan and BTH as the "Conspiracy Defendants").

10.     General Electric Capital Corporation is a Delaware corporation with its principal place of business in Maryland doing business in Tennessee (hereinafter referred to as "General Electric").

11.     Upon information and belief, Cerone owns or owned all of the membership interests of Southland.

12.     Lunan is the Chief Executive Officer, a director and a principal shareholder of BTH.

13.     Crawford owns or owned 77.5% of the outstanding capital stock of Emergystat and Donovan owns or owned 12.5% of the outstanding capital stock of Emergystat.

14.     Certain of the claims herein arise under the laws of the United States of America. All claims herein are so related they form part of the same case or controversy within the meaning of Article III of the United States Constitution. This Court therefore, has jurisdiction of all claims herein under 28 U.S.C.A. § 1331 and 28 U.S.C.A. § 1367(a).

15.     A substantial number of the events that comprise the basis for Plaintiff's claims transpired in this district and division, and a substantial portion of the property at issue is located in this district and division. Accordingly, venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(b).

3

# FACTUAL ALLEGATIONS

16.     On or about July 19, 1996, Pacific loaned $1,000,000 to Quality Care Ambulance

Service, Inc., a Tennessee corporation, and Quality Transportation Services, Inc., a Tennessee

corporation (which corporations are hereinafter collectively referred to as "QA/QT" and which

transaction is hereinafter referred to as the "Loan"). To evidence the obligations of QA/QT to

Pacific in connection with the Loan, QA/QT executed a Secured Promissory Note dated July 19,

1996, a copy of which Secured Promissory Note is attached hereto as Exhibit 1, and entered into

a Loan and Security Agreement dated July 19, 1996 with QA/QT, a copy of which Loan and

Security Agreement is attached hereto as Exhibit 2 (which Secured Promissory Note and Loan

and Security Agreement are sometimes hereinafter referred to collectively as the "Loan

Documents").

17.     To secure repayment of the Loan and of all other obligations of QA/QT to Pacific,

QA/QT granted to Pacific pursuant to the terms of the Loan and Security Agreement, a security

interest under the Uniform Commercial Code of Tennessee in and to substantially all assets of

QA/QT. Among other items of tangible and intangible personal property covered by the security

interest granted to QA/QT, are "all customer...contracts," "other contracts and contract rights,"

"all accounts, accounts receivable...whether now in existence...or hereafter acquired,"

"customer lists," "goodwill," "all right, title and interest under leases...relating to real or

personal property," "all other personal property assets," and "all...causes of action, claims...of

every kind and nature."

18.     The security interest granted by the Loan and Security Agreement was perfected

by Pacific in accordance with the Tennessee Uniform Commercial Code by the filing of Form

4

UCC-1 financing statements with the Tennessee Department of State on July 26, 1996 and by the

filing of Form UCC-3 financing statement amendments (continuation statements) on July 3,

2001, copies of which UCC-1 financing statements and UCC-3 continuation statements are

attached hereto as Exhibit 3.

19.     Section 4.1 of the Loan and Security Agreement, Ex. 2, reads in relevant part as

follows:

>    Borrower covenants and agrees as follows:
>
>    4.1     Sales of and Encumbrances on Collateral.
>    Borrower will not sell, exchange, lease...or otherwise dispose of
>    any Collateral...without Lender's prior written consent.

20.     Section 4.16 of the Loan and Security Agreement, Ex. 2, reads in relevant part as

follows:

>    Borrower covenants and agrees as follows:
>
>    4.16     Merger, Consolidation and Sale of Assets.
>    Borrower will not...merge or consolidate with any other entity or
>    sell, lease or transfer or otherwise dispose of all or a substantial
>    portion of its assets to any person or entity . . . .

21.     Cerone, together with his wife, owns approximately 70% of the outstanding

capital stock of QA/QT, and are the two directors of QA/QT. Cerone is the president of QA/QT.

22.     On March 22, 2002, the United States Bankruptcy Court for the Eastern District

of Tennessee confirmed the First Amendment to Second Modification to Plan of Reorganization

filed by Quality Care Ambulance Service, Inc. (Case No. 00-22580) and confirmed the First

Amendment to Second Modification to Plan of Reorganization filed by Quality Transportation

Services, Inc. (Case No. 00-22579) (hereinafter sometimes referred to collectively as the

"Reorganization Plans").

5

23.     Paragraph 4 of Class III(C) (Secured Claims) of Article VI (Treatment of Creditors) of the Second Modification to Disclosure incorporated in the Reorganization Plans reads as follows:

> All of Pacific's Loan Documents, including its Secured Promissory Notes, its Loan and Security Agreement, and all applicable Financing Statements, including any Continuation Statements filed subsequent to the filing of the petitions in this case, shall, except to the extent herein modified, [i.e., principal amount, interest rate and payment terms of the Secured Promissory Note] remain in full force and effect.

24.     Paragraph 6 of Class III(C) (Secured Claims) of Article VI (Treatment of Creditors) of the Second Modification to Disclosure incorporated in the Reorganization Plans reads as follows:

> Pacific's security interest in its Collateral shall continue and shall have an equal priority to its Pre-Petition liens and security interests, in the post-confirmation Collateral of the Debtor.

25.     QA/QT have defaulted in their obligations to Pacific under the Loan Documents and the Reorganization Plans with respect both to the payments that were to have been made to Pacific and to various requirements to provide financial reports and information to Pacific.

26.     As a consequence of such defaults, there is currently owed to Pacific, all of which is immediately due and payable, a principal balance of $874,437.44, plus interest accrued thereon and, pursuant to the terms of the Loan and Security Agreement, various expenses incurred by Pacific in attempting to collect the amounts due to Pacific and to enforce Pacific's rights under the Loan Documents, including without limitation, all attorneys' fees incurred by Pacific.

6

27.     Cerone had actual knowledge of all of Pacific's rights under the Loan and Security Agreement (including the first perfected security interest pursuant thereto) because Cerone signed such document. Cerone had actual knowledge of such rights being preserved under the terms of the Reorganization Plans because Cerone approved the Reorganization Plans in his capacity as president, director and majority shareholder of QA/QT.

28.     Emergystat, Southland, Crawford, Donovan and Panter (i) upon information and belief, had actual knowledge of all of Pacific's rights under the Loan and Security Agreement and the preservation of such rights under the Reorganization Plans by reason of information and materials furnished to them by Cerone in connection with the proposed transactions described below, (ii) had constructive knowledge of Pacific's first perfected security interest by reason of the filing by Pacific of the documents attached hereto as Exhibit 3, (iii) had constructive knowledge of the preservation of all of Pacific's rights under the Loan and Security Agreement (including the security interest) by reason of the Reorganization Plans which are public documents, (iv) had actual knowledge of all of Pacific's rights under the Loan and Security Agreement and the preservation thereof under the Reorganization Plans from and after June 11, 2004 by reason of notice given by Pacific to legal counsel for Emergystat (Panter's partner) on such date, and (v) are charged with actual knowledge of all of Pacific's rights under the Loan and Security Agreement (including the security interest) and the preservation thereof pursuant to the Reorganization Plans by reason of being co-conspirators with Cerone in the wrongful actions hereinafter described.

29.     During the period from March 2004 through May 2004, Cerone described to Pacific in general terms proposed transactions by which a new entity, 92% of the capital stock of which would be owned by Crawford, Donovan and Cerone, would acquire Emergystat and

7

QA/QT. Specifically acknowledging Pacific's right to consent to any such transaction affecting QA/QT under the provisions of the Loan and Security Agreement and by reason of Pacific's security interest in all the assets of QA/QT, Cerone requested itemization of the terms which Pacific would require to grant such consent, which information was promptly furnished to Cerone by Pacific.

30.     On June 2, 2004, Cerone caused to be sent to the shareholders of QA/QT (including Pacific) notice of a shareholders meeting to approve the sale of various assets of QA/QT to Southland, a transaction preliminary to that contemplated by those described in the preceding paragraph. Although Cerone, as the majority shareholder of QA/QT, caused such sale of assets of QA/QT to Southland to be approved at the shareholders meeting held on June 28, 2004, Pacific dissented from such transaction under the applicable provisions of the Tennessee Corporation Code and expressly informed Cerone, QA/QT and Southland that Pacific had not, was not, and would not consent to such transaction as was its right under the Loan and Security Agreement unless its rights under the Loan and Security Agreement (including its security interest in all of the assets of QA/QT) were protected in the manner previously specified by Pacific.

31.     The purported approval of the sale of assets of QA/QT to Southland is legally ineffective by reason of both (i) the fraud perpetrated on the minority shareholders of QA/QT thereby because of the conflict of interests and self-dealing inherent in such transaction (Cerone being the sole member of Southland at the time of the purported sale) by which Cerone "approved" the sale to himself over the objections of the other shareholders of QA/QT, and (ii) the purported approval failed to comply with the requirements of Section 48-18-302 of the Tennessee Business Corporation Act.

8

32.     In a conference call on June 29, 2004 among Pacific's representative and its legal counsel, and Cerone and counsel identified as representing Cerone, and separate counsel identified as representing QA/QT, Cerone disclosed to Pacific for the first time that he had signed a Management Agreement with Emergystat contemplating Emergystat furnishing various management services to QA/QT.

33.     Conspiracy Defendants have verbally acknowledged, and Cerone's attorney has confirmed in writing, that an amendment to the Management Agreement was also executed, which amendment according to Cerone's description thereof, provided for Emergystat to bill customers of QA/QT for services provided by QA/QT from and after May 2, 2004 and to collect the accounts receivable of QA/QT represented by such billings, and to lend to QA/QT such funds for its operations as may be required from time to time.

34.     Despite repeated demands by Pacific to the Conspiracy Defendants, Conspiracy Defendants have failed and refused to provide to Pacific a copy of the amendment to the Management Agreement.

35.     The activities being conducted pursuant to the terms of the Management Agreement, as purportedly amended, were represented by Conspiracy Defendants to be an interim temporary operating structure pending closing of the transactions referenced in paragraph 29 above, draft documents for which had been generated at least as early as May 10, 2004 and revised drafts of which were furnished to Pacific in early July 2004.

36.     Despite repeated demands by Pacific that Conspiracy Defendants close the proposed transactions referenced in paragraph 29 above, Conspiracy Defendants failed and refused to complete such transactions.

9

37. Although Conspiracy Defendants represented to Pacific that the only services to be provided and actions taken by Emergystat pursuant to the Management Agreement, as purportedly amended, would be as described in paragraph 33 above, Pacific, upon information and belief based on statements made by Conspiracy Defendants at various times, now understands that:

a) Substantially all employees of QA/QT were hired by Emergystat in early May 2004, leaving QA/QT with no employees to conduct any operations other than collection of accounts receivable generated prior to May 2, 2004.

b) Various contracts between QA/QT and its customers have been terminated by Conspiracy Defendants or simply ignored, with Emergystat entering into new contracts with such customers to provide the same services specified in the contracts which existed between such customers and QA/QT.

c) Instead of billing in the name of QA/QT for services provided by QA/QT, Conspiracy Defendants have billed all services provided to the customers of QA/QT under the "Emergystat" name.

d) Emergystat has purportedly "leased" from QA/QT all of the equipment (primarily ambulances) required to provide services to the customers of QA/QT.

38. Pacific has not consented to any of the actions described herein pursuant to which Emergystat has realized the benefit of the goodwill of QA/QT, the contracts with customers of QA/QT and the use of equipment of QA/QT, without having provided any consideration to QA/QT and without obtaining the consent of Pacific as required by the Loan and Security Agreement.

10

39. Emergystat, Southland, Crawford, Donovan, Panter and Cerone conspired in the actions described herein to obtain for their benefit the value of the goodwill of QA/QT, the contracts with customers of QA/QT and the use of the equipment previously used by QA/QT.

40. In December 2004, Emergystat informed Pacific that BTH had agreed to acquire Southland Health Services, Inc., and as a consequence of concurrently closing the transactions contemplated by paragraph 29 and paragraph 30 above, BTH would thereby be acquiring Emergystat and Southland, at which closing Pacific would be paid the entire amount due Pacific by QA/QT.

41. Attached hereto as Exhibit 4 is a Press Release of BTH announcing the execution of a binding letter of intent to conclude such transactions.

42. In conversations with a representative of Pacific, Lunan confirmed such transaction and in an effort to obtain forbearance by Pacific from asserting rights under the Reorganization Plans, arranged for the representative of Pacific to contact the sources of the financing required by BTH to conclude such transaction, which financing sources confirmed to Pacific their commitment to provide the funding required by BTH.

43. On December 22, 2004, Lunan was given written notice of the existence of the Loan Documents and of the Reorganization Plans and of Pacific's rights thereunder, including the first perfected security interest in all of the assets of QA/QT.

44. Lunan and BTH (i) upon information and belief, had actual knowledge of all of Pacific's rights under the Loan and Security Agreement and the preservation of such rights under the Reorganization Plans by reason of information and materials furnished to them by Emergystat, Southland, Crawford, Donovan and/or Panter in connection with the transactions described in Ex. 4, (ii) had constructive knowledge of Pacific's first perfected security interest by

11

reason of the filing by Pacific of the documents attached hereto as Ex. 3, (iii) had constructive knowledge of the preservation of all of Pacific's rights under the Loan and Security Agreement (including the security interest) by reason of the Reorganization Plans which are public documents, (iv) had actual knowledge of all of Pacific's rights under the Loan and Security Agreement and the preservation thereof under the Reorganization Plans from and after December 22, 2004 by reason of the notice given to Lunan on such date as described in paragraph 43 above, and (v) are charged with actual knowledge of all of Pacific's rights under the Loan and Security Agreement (including the security interest) and the preservation thereof pursuant to the Reorganization Plans by reason of being co-conspirators with all other Conspiracy Defendants in the wrongful actions herein described.

45.     Upon information and belief based on communications to Pacific from legal counsel for QA/QT, the transactions described in paragraph 40 hereof were concluded in early February 2005.

46.     Pacific has not consented to any of the actions described herein pursuant to which BTH has realized the benefit of the goodwill of QA/QT, the contracts with customers of QA/QT and the use of equipment of QA/QT, without having provided any consideration to QA/QT and without obtaining the consent of Pacific as required by the Loan and Security Agreement.

47.     Conspiracy Defendants have conspired in the actions described herein to obtain for their benefit the value of the goodwill of QA/QT, the contracts with customers of QA/QT and the use of the equipment previously used by QA/QT.

## COUNT I

## MALICIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS (COMMON LAW)

48.     Plaintiff realleges and restates paragraphs 1-47 as if fully set forth herein.

12

49. Through the actions of Conspiracy Defendants described herein, Conspiracy Defendants have intentionally and maliciously interfered with the contractual relationships between Pacific and QA/QT and between QA/QT and its customers (which customer contracts are subject to the security interest of Pacific), thereby denying to Pacific the benefit of such contracts and business relationships, to the substantial damage of Pacific.

WHEREFORE, Pacific demands Judgment against Conspiracy Defendants, jointly and severally, for damages in an amount equal to all amounts owed to Pacific by QA/QT, plus attorney fees, interest and costs.

## COUNT II

## PROCUREMENT OF BREACH OF CONTRACTS (STATUTORY)

50. Plaintiff realleges and restates paragraphs 1-49 as if fully set forth herein.

51. Conspiracy Defendants' actions described herein have induced and procured the breach or violation of the Loan and Security Agreement between Pacific and QA/QT and the breach and failure to perform by QA/QT of various contracts with its customers in contravention of Tenn. Code Ann. § 47-50-109.

WHEREFORE, Pacific demands Judgment against Conspiracy Defendants, jointly and severally, pursuant to said Section 47-50-109, of treble the amount of damages resulting from or incident to the breach of each contract induced or procured by the actions of Conspiracy Defendants.

## COUNT III

## CONVERSION

52. Plaintiff realleges and restates paragraphs 1-51 as if fully set forth herein.

13

53. The actions of Conspiracy Defendants have resulted in the conversion to Conspiracy Defendants' benefit of valuable property and property rights of Pacific and QA/QT, including without limitation, the goodwill of QA/QT, the customer contracts of QA/QT and the use of the equipment of QA/QT and Pacific's first perfected security interest therein.

54. Pacific has been damaged in an amount equal to the value of the converted property and property rights in which Pacific had a first perfected security interest.

WHEREFORE, Pacific demands Judgment in an amount equal to the value of the property and property rights converted, as will appear from evidence at trial.

## COUNT IV

## FRAUD/MISREPRESENTATION

55. Plaintiff realleges and restates paragraphs 1-54 as if fully set forth herein.

56. Through Conspiracy Defendants' actions, Conspiracy Defendants actively and wrongfully concealed from Pacific the true nature of the transactions thereby achieving a *de facto* acquisition of QA/QT without the consent of Pacific and without compensation to QA/QT under circumstances that created a duty in the Conspiracy Defendants to disclose the same, while repeatedly falsely stating Conspiracy Defendants' intentions to conclude such transactions on a basis which recognized Pacific's rights by reason of the indebtedness due Pacific from QA/QT and Pacific's first perfected security interest in all of the assets of QA/QT.

57. Conspiracy Defendants' withholding information from Pacific, and their actual statements to Pacific, constituted intentional misrepresentations.

58. Conspiracy Defendants intended Pacific to rely on Conspiracy Defendants' fraudulent misrepresentations.

14

59.     Plaintiff has, in fact, reasonably relied on information supplied by Conspiracy Defendants, statements made by Conspiracy Defendants, and the information withheld by Conspiracy Defendants, to its substantial detriment.

WHEREFORE, Pacific demands Judgment against the Conspiracy Defendants, jointly and severally, for its damages, up to and including the full amount of the QA/QT indebtedness, including reliance on the representations alleged.

## COUNT V

## NEGLIGENT MISREPRESENTATION

60.     Plaintiff realleges and restates paragraphs 1-59 as if fully set forth herein.

61.     Through Conspiracy Defendants' actions and statements, Conspiracy Defendants knowingly or negligently concealed from Pacific the true nature of the transactions thereby achieving a *de facto* acquisition of QA/QT without the consent of Pacific and without compensation to QA/QT.

62.     Conspiracy Defendants' withholding information from Pacific, and their actual statements to Pacific, constituted negligent misrepresentations.

63.     Pacific relied to its substantial detriment on Conspiracy Defendants' representations, statements, and withheld information. Those collective representations have later proved to be false.

WHEREFORE, Pacific demands Judgment against the Conspiracy Defendants, jointly and severally, for its damages, up to and including the full amount of the QA/QT indebtedness, including reliance on the representations alleged.

15

## COUNT VI

### PROMISSORY FRAUD

64. Plaintiff realleges and restates paragraphs 1-63 as if fully set forth herein.

65. Conspiracy Defendants made promises to Pacific which intentionally concealed and misrepresented the true nature of the Conspiracy Defendants' transactions described above. The Conspiracy Defendants falsely promised to conclude the transactions on a basis which recognized Pacific's rights by reason of the indebtedness due Pacific from QA/QT and Pacific's first perfected security interest in all of the assets of QA/QT.

66. Conspiracy Defendants made those promises without an intention to fulfill them.

67. Conspiracy Defendants intended that Pacific would rely on their promises.

68. Plaintiff did, in fact, rely on the promises supplied by Conspiracy Defendants to its substantial detriment.

WHEREFORE, Pacific demands Judgment against the Conspiracy Defendants, jointly and severally, for its damages, up to and including the full amount of the QA/QT indebtedness, including reliance on the promises alleged.

## COUNT VII

### RESCISSION/INJUNCTION

69. Plaintiff realleges and restates paragraphs 1-68 as if fully set forth herein.

70. Prior to commencing business activities in Tennessee and Virginia as a consequence of Conspiracy Defendants' wrongful actions described herein, neither Emergystat, nor any affiliate thereof, conducted any activities in Tennessee and Virginia.

71. Emergystat has admitted that as of June 30, 2004, accounts receivable in the amount of $1,670,000 had been generated arising solely from customers of QA/QT in Tennessee

16

and Virginia generated in large part by Emergystat using QA/QT's equipment and by employing the former employees of QA/QT.

72.     By reason of the wrongful actions of Conspiracy Defendants as described herein and the absence of any consent by Pacific thereto as required under the Loan and Security Agreement, the Management Agreement and all business conducted by Emergystat as a result of appropriating the goodwill of QA/QT, the customer contracts of QA/QT and using the equipment of QA/QT for Emergystat's benefit should be rescinded, or alternatively be declared to be subject to the Security Interest of Pacific, and Emergystat mandatorily enjoined to turn over the proceed of such accounts to Pacific.

WHEREFORE, Pacific demands Judgment and an Order rescinding the Management Agreement and all business activity conducted by Emergystat pursuant thereto or arising out of the misappropriation of the goodwill of QA/QT, the customer contracts of QA/QT and the use of the equipment of QA/QT, restoring to QA/QT all such goodwill, contracts and equipment and assigning to QA/QT all accounts receivable generated from services provided in the states of Tennessee and Virginia, or alternatively, the declaration that all such contracts and accounts are subject to the Security Interest of Pacific, together with a permanent injunction requiring the turn over of the proceeds of such accounts to Pacific.

## COUNT VIII

## UNJUST ENRICHMENT

73.     Plaintiff realleges and restates paragraphs 1-72 as if fully set forth herein.

74.     Through the wrongful actions of Conspiracy Defendants described herein, Conspiracy Defendants have appropriated substantially all of the assets of QA/QT, including without limitation, the valuable goodwill of QA/QT, the customer contracts of QA/QT and the

17

equipment of QA/QT, and are benefiting from their use and possession without compensation to parties having an interest in such assets, including Pacific and QA/QT.

WHEREFORE, Pacific demands Judgment on the Conspiracy Defendants, jointly and severally, in an amount up to the value of all assets diverted to the use and benefit of Conspiracy Defendants.

## COUNT IX

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

75. Plaintiff realleges and restates paragraphs 1-74 as if fully set forth herein.

76. QA/QT engaged in, or its activities affected, interstate commerce.

77. The actions of Conspiracy Defendants described herein include, as to each Defendant, more than two communications constituting fraudulent use of the United States mail to defraud and appropriate the property of another in violation of 18 U.S.C.A. § 1341 and constituting wire fraud in violation of 18 U.S.C.A. § 1343. Those mail and wire communications occurred on several occasions, including but not limited to those occurring June 28, 29, 2004; July 20, 29, 2004; August 4, 13, 31, 2004; November 2, 2004; and December 14, 21, 2004, and took various forms including telephone statements, facsimile transmissions, and correspondence mailed in the United States mail. Those communications contained the representations and statements outlined above.

78. Through the actions of Conspiracy Defendants described herein, Conspiracy Defendants acquired and have maintained an interest in or control of QA/QT through a pattern of racketeering activity in contravention of 18 U.S.C.A. § 1962(b). The actions of the Conspiracy Defendants constitutes a pattern under 18 U.S.C.A. § 1961(5) indicating continuity of their activity. Those actions are presently continuing.

18

79.     As a direct consequence of Conspiracy Defendants having acquired and maintained an interest in or control of QA/QT, Pacific has been damaged by reason of Conspiracy Defendants' total disregard of Pacific's rights under the Loan Documents and the Reorganization Plans, including without limitation, the appropriation, conversion, use or destruction of valuable property and property rights of QA/QT in which Pacific had a first perfected security interest, including without limitation, the goodwill of QA/QT, the customer contracts of QA/QT and the use of the equipment of QA/QT.

WHEREFORE, Pacific demands Judgment against the Conspiracy Defendants, jointly and severally, for its damages as established by the evidence, together with an award of punitive damages in the amount of Ten Million Dollars ($10,000,000.00).

## COUNT X

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT – CONSPIRACY (RICO)

80.     Plaintiff realleges and restates paragraphs 1-79 as if fully set forth herein.

81.     Through the actions of Conspiracy Defendants described herein, Conspiracy Defendants conspired to violate the provisions of 18 U.S.C.A. § 1962(b) in contravention of 18 U.S.C.A. § 1962(d).

82.     As a direct consequence of Conspiracy Defendants' conspiracy to violate the provisions of 18 U.S.C.A. § 1962(b), Pacific has been damaged by reason of Conspiracy Defendants' total disregard of Pacific's rights under the Loan Documents and the Reorganization Plans, including without limitation, the appropriation, conversion, use or destruction of valuable property and property rights of QA/QT in which Pacific had a first perfected security interest, including without limitation, the goodwill of QA/QT, the customer contracts of QA/QT and the use of the equipment of QA/QT.

19

WHEREFORE, Pacific demands Judgment against the Conspiracy Defendants, jointly and severally, for its damages as established by the evidence, together with an award of punitive damages in the amount of Ten Million Dollars ($10,000,000.00).

## COUNT XI

## DECLARATORY JUDGMENT (GENERAL ELECTRIC)

83.    Plaintiff realleges and restates paragraphs 1-82 as if fully set forth herein.

84.    Emergystat has granted to General Electric a security interest in substantially all of its assets, including without limitation, "all accounts, accounts receivable" and "contract rights."

85.    Pacific reasonably believes that a dispute exists between Pacific and General Electric as to the priority of the respective security interests in such accounts receivable.

86.    All accounts and accounts receivable arising out of services furnished by Emergystat in Tennessee and Virginia to customers of QA/QT and/or utilizing the equipment of QA/QT, are subject to the first perfected security interest of Pacific in such accounts receivable.

87.    General Electric had constructive knowledge of Pacific's security interest in such account and accounts receivable by reason of the filing by Pacific of the documents attached hereto as Ex. 3.

WHEREFORE, Pacific requests a determination by this Honorable Court that Pacific's security interest in all accounts receivable arising out of services furnished by Emergystat in Tennessee and Virginia to customers of QA/QT and/or utilizing the equipment of QA/QT is a first perfected security interest and that the security interest of General Electric, if any, is inferior and subordinate to such security interest of Pacific.

20

## COUNT XII

## IMPOSITION OF TRUST (GENERAL ELECTRIC)

88.     Plaintiff realleges and restates paragraphs 1-87 as if fully set forth herein.

89.     General Electric is collecting accounts receivable of Emergystat under a so-called "lockbox" arrangement in that customers send payments directly to General Electric or to a post office box under the exclusive control of General Electric.

90.     Upon information and belief, payments being collected by General Electric include accounts receivable in which Pacific has the first perfected security interest, directly or as the proceeds from the *de facto* sale of the business of QA/QT.

WHEREFORE, Pacific requests an order of this Honorable Court requiring General Electric to segregate all funds collected from such accounts receivable and to hold such funds in a separate account in trust for Pacific during the pendency of this action.

## COUNT XIII

## RESTITUTION (GENERAL ELECTRIC)

91.     Plaintiff realleges and restates paragraphs 1-90 as if fully set forth herein.

92.     General Electric has wrongfully collected the accounts receivable in which Pacific has a first perfected security interest and applied the proceeds of such collections to reduction of the indebtedness of Emergystat to General Electric to the benefit of General Electric and Emergystat.

WHEREFORE, Pacific requests damages against General Electric in a amount equal to all accounts receivable collected by General Electric in which Pacific had a first perfected security interest up to an amount equal to the total amounts owed to Pacific by QA/QT.

21

## COUNT XIV

### IMPOSITION OF TRUST (BTH)

93. Plaintiff realleges and restates paragraphs 1-92 as if fully set forth herein.

94. Upon information and belief, amounts being collected by BTH include accounts receivable in which Pacific has a first perfected security interest, directly or as the proceeds from the sale of the business of QA/QT.

WHEREFORE, Pacific requests an order of this Honorable Court requiring BTH to segregate all funds collected from such accounts receivable and to hold such funds in a separate account in trust for Pacific during the pendency of this action.

### COUNT XV

### RESTITUTION (BTH)

95. Plaintiff realleges and restates paragraphs 1-94 as if fully set forth herein.

96. BTH has and continues to wrongfully collect the accounts receivable in which Pacific has a first perfected security interest.

WHEREFORE, Pacific requests damages against BTH in an amount equal to all accounts receivable collected by BTH in which Pacific had a first perfected security interest up to an amount equal to the total amounts owed to Pacific by QA/QT.

### COUNT XVI

### FORECLOSURE OF PLEDGED SECURITIES (CERONE)

97. Plaintiff realleges and restates paragraphs 1-96 as if fully set forth herein.

98. Cerone and Pacific executed a Stock Pledge Agreement dated July 19, 1996, a copy of which is attached hereto as Exhibit 5, pursuant to which Cerone pledged all of his securities in QA/QT to secure payment of the indebtedness of QA/QT to Pacific.

22

99.     In addition to the securities of QA/QT, the Stock Pledge Agreement provides that anything of value received as "proceeds" of the securities of QA/QT and all "additional securities or other property at any time and from time to time receivable or otherwise distributable in respect of, or in exchange for, or in substitution for" the securities of QA/QT also constitute "Pledged Securities" subject to the terms and provisions of the Stock Pledge Agreement.

100.     The membership interest of Cerone in Southland and the stock or other securities, if any, of BTH received by Cerone in connection with the transactions described in paragraph 40 above constitute "Pledged Securities" subject to the Stock Pledge Agreement by reason of the language thereof quoted in the preceding paragraph.

101.     By reason of the default by QA/QT under the Loan Documents and Reorganization Plans, Pacific is entitled to sell the Pledged Securities applying the proceeds thereof in partial satisfaction of the amounts due Pacific by QA/QT.

WHEREFORE, Pacific prays that this Honorable Court enter an order directing Cerone to deliver to Pacific possession of any and all documents evidencing his ownership of the membership interest of Southland and/or stock or other securities of BTH to be disposed of pursuant to the terms of the Stock Pledge Agreement.

## COUNT XVII

## FORECLOSURE OF PACIFIC'S SECURITY INTERESTS

102.     Plaintiff realleges and restates paragraphs 1-101 as if fully set forth herein.

103.     By reason of the default by QA/QT under the Loan and Security Agreement Pacific is entitled to possession of the Collateral.

23

104.     Pacific has demanded that Conspiracy Defendants deliver to Pacific possession of the Collateral subject to the Loan and Security Agreement but Conspiracy Defendants have failed and refused to deliver possession of such Collateral to Pacific.

WHEREFORE, Pacific prays that this Honorable Court enter an order directing Conspiracy Defendants to deliver to Pacific possession of all Collateral, including without limitation, all goodwill, all customer lists and information, all customer contracts, all equipment, and all accounts receivable generated in providing services to former customers of QA/QT or utilizing equipment of QA/QT, during the pendency of this action and enter a final Judgment against Defendants directing Conspiracy Defendants to deliver possession of such Collateral permanently to Pacific.

## COUNT XVIII

## BREACH OF FIDUCIARY DUTIES (CERONE)

105.     Plaintiff realleges and restates paragraphs 1-104 as if fully set forth herein.

106.     The actions of Cerone described herein constitute breach of his fiduciary duties as a director of QA/QT under Section 48-18-301 and Section 48-18-302 of the Tennessee Business Corporation Act.

107.     Pacific has been damaged by the erosion of assets of QA/QT in which Pacific has a first perfected security interest to secure payment of amounts due Pacific by QA/QT.

108.     Pacific has been damaged by the loss of value of the shares of stock of QA/QT owned by Pacific.

WHEREFORE, Pacific demands Judgment against Cerone for damages equal to the diminution of value of its shares, as may be established by evidence at trial.

24

## COUNT XIV

## UNLAWFUL DISTRIBUTION (CERONE)

109. Plaintiff realleges and restates paragraphs 1-108 as if fully set forth herein.

110. The actions of Cerone described herein, particularly the transaction described in paragraph 30 hereof, effectively constitutes a distribution to Cerone as a shareholder of QA/QT unlawful by reason of the provisions of Section 48-18-304 and Section 48-16-401 of the Tennessee Business Corporation Act.

111. By reason of such unlawful distribution, QA/QT has not been able to pay Pacific the amounts due Pacific.

WHEREFORE, Pacific prays that this Honorable Court enter a Judgment against Cerone for damages in an amount equal to all amounts owed to Pacific by QA/QT plus attorneys' fees, interest and costs.

Respectfully submitted,

PACIFIC CAPITAL, L.P.

By: _____

ROBERT L. ARRINGTON (BPR# 001108)
ANDREW T. WAMPLER (BPR# 021743)
Attorneys for Plaintiff

OF COUNSEL:

WILSON WORLEY MOORE GAMBLE & STOUT PC
2021 Meadowview Lane, 2nd Floor
Eastman Credit Union Building
Kingsport, Tennessee 37662
(423) 723-0400

25